125    707
134    140

Susan M. Eastwood v. Jennie Crane, et al., and George Eastwood, Appellant.

**Oral contract to convey land:** EVIDENCE. To establish an oral contract for the conveyance of land, the proof must be clear and satisfactory. Under this rule, the evidence in an action for partition, in which a son sought to establish an oral contract by which he was to have certain land, in consideration that he remain with his parents and manage the property, is held insufficient.

**Homesteads:** RIGHTS OF WIDOW. The oral contract of a father alone, to give his son a farm which includes the homestead in consideration for his remaining at home and managing the same, will not estop the widow from insisting that the homestead be set off to her as a part of her dower interest.

**Estates of decedents:** VALUATION OF ADVANCEMENTS. Under Code, section 3383, the value of real property given by an intestate by way of advancement to an heir for the purposes of settlement of the estate, is its value at the death of decedent, based on its condition at the time the advancement was made.

**Revision of statutes:** CHANGE IN PHRASEOLOGY. A mere change of phraseology in the Code revision of 1897 does not change the law then existing, unless it clearly appears that such was the intention of the legislature.

*Appeal from Story District Court.*— Hon. Geo. W. Dyer, Judge.

WEDNESDAY, NOVEMBER 23, 1904.

ACTION by plaintiff, as widow of Asa F. Eastwood, deceased, against the heirs of her deceased husband for partition of the real estate of which he died seized, consisting of a farm of two hundred and eight acres, including the homestead. The defendant George Eastwood by answer and cross-petition claims title to the property under an alleged oral contract with the deceased and plaintiff that the property should be his after their death, and that in the mean-

time he should take care of them, occupy the farm as tenant, and by way of rent pay one-half the produce. The court found against defendant George Eastwood as to the alleged contract, and dismissed his cross-petition, but allowed him $600 for labor and expense in making improvements on the farm, and charged against the other defendants by way of advancements certain tracts of real property conveyed during decedent's lifetime at their value at the time of such conveyance, and ordered partition on this basis. The defendant George Eastwood appeals.— *Modified and affirmed.*

*McCarthy & Lee,* for appellant.

*J. L. Stevens, S. R. Dyer,* and *G. A. Underwood,* for appellees.

McClain, J.— In 1881 Asa F. Eastwood, now deceased, and the plaintiff, his wife, were residing on the premises to which the present controversy relates, consisting of a farm of two hundred and eight acres. They had three children living, all of them married, two of whom — George Eastwood and Jennie Crane — are defendants in this action. The third and youngest, Ellis Eastwood, has since disappeared, and is supposed to be deceased; and his two sons, as his heirs, are also made defendants. At this time the deceased had already given an eighty-acre farm to George, and another farm of one hundred and twenty-five acres to Jennie. He desired Ellis and his wife to live with him on the home farm; but Ellis was unwilling to do so, and it was agreed that George should deed to Ellis the eighty-acre farm which he then had, and go to reside on the home place. This arrangement was carried out, and the deceased added eighty-five acres to the eighty acres already given to George, and this whole tract was conveyed to Ellis. The evidence tends to show that as a part of the arrangement it was agreed between George and his parents that he should live on the home farm, and take care of his parents, paying one-half the

grain produced on the farm by way of rent so long as either of his parents should live, and after the death of both of them should be the owner of the farm, subject to some obligation to pay the other heirs amounts of money by reason of the excess in value of the home farm over the values of the respective farms already given to the other children. The evidence as to this last condition of the agreement is uncertain, and no specific amounts are shown to have been fixed. In 1884 George became dissatisfied with the arrangement, whatever it was, either because his father refused to give him any deed or other written evidence of the agreement, or for failure of his father to provide for him a better house, and took his family to Nebraska, where he resided for nearly nine years. In 1891 there was correspondence between the father and George relative to the latter's returning, and in August of that year George came on a visit to his parents, and on that occasion, as he testified, entered into a definite arrangement with his parents, by which he was to move back on the home place, and occupy it on the same terms as those under which he was occupying it prior to his removal to Nebraska. He did return with his family in the following March, and has resided on the home place ever since. He now claims an equitable title to the farm under this agreement, subject to the obligation to care for his mother so long as she lives, and in the meantime to pay her as rent one-half the grain produced on the farm.

I.     The first difficulty with which we are confronted with reference to the appellant's claim is the indefiniteness and uncertainty of the evidence to support it. Appellant

1. ORAL CONTRACT and his wife, of course, are incompetent to
TO CONVEY
LAND: evi-     testify as to any contract with the father, now
dence.
deceased. Many witnesses introduced in behalf of the appellant speak of conversations with deceased, in which he admitted in general terms that George was to occupy the farm until the death of his parents, and that then he should have it; but these admissions of deceased are

quite as consistent with an intention on his part to make a
future disposition of the farm for George's benefit as any
pre-existing contract for a conveyance or other disposition
in George's favor.    To one witness he said that he did not
want to put the farm out of his name while he lived; that he
did not want it to be so but what he could control it while
he lived, but he intended for George to have it.    The letters
written by the father to George in Nebraska are equally
indefinite.    He urges George to return, but the letters are
as consistent with an intention that George should return
and farm the home place with an indefinite understanding
that some provision would be made for him in the future
as with a purpose to renew the former agreement, or recog-
nize him as the owner, subject to the care of his parents
during their lives, and payment of a share of the produce by
way of rent during that time.    In one letter he says, "I
think you better be here farming."    In another: "We are
quite feeble, not able to work, and I can't get any one to
plow my corn.    There is no hand to hire here.    I think you
better come and run this farm immediately."    In another:
"In answer to your question, you can have half of what
you raise.    You have spent seven years and got nothing.
I have made enough to buy a farm.    You don't take my
advice, so you see how you have done.    *    *    *    You
ought to be here now to build a hay barn and corn cribs and
fences, lots of yards and sheds.    There is more than you
can get things righted up against another year."    And in
the last letter, written a week before George's return on a
visit: "You wanted to know what I was going to do.    I
am going to take care of what I have as long as I can.    If
you come back, and do as you ought to, you will share a
good part, and I want to know 'Yes' or 'No' at once, so
I can have fall plowing done.    You can live in with us till
we make other arrangements."

It is elementary that, to make out an oral contract to
convey, the evidence must be clear and satisfactory.    We

fail to find any clear and satisfactory evidence of the recognition on the part of the father of any title in George to the farm under any previous arrangement, or any new arrangement by which such title was created. Even if the arrangement made in 1881 amounted to a contract giving George title on condition that he care for his parents during their lifetime and occupy the farm in the meantime as tenant, that arrangement was broken by the abandonment of the farm by George and his removal to Nebraska, and we find no satisfactory proof that the breach was waived by the father, or that the arrangement was renewed.

II. Prior to the adoption of the Code of 1897, no oral contract to convey premises including the homestead was of any validity (see section 1990, Code 1873); but since the adoption of the Code of 1897 a contract made 2. HOMESTEADS: by the husband or wife holding the legal title rights of widow. "may be enforced as to the real estate other than the homestead at the option of the purchaser or incumbrancer." (Section 2974). No doubt the husband or wife of the owner might, by conduct, be estopped from setting up a homestead claim as against the rights of one taking possession and making improvements under an oral contract, the husband or wife having knowledge of the claim under which possession was taken and improvements made; but we have no such case here as against the plaintiff. No contract on her part that George should have the home farm in consideration of occupying it as tenant and caring for his parents is made out. We cannot hold under the evidence that plaintiff has lost any of her rights which existed prior to the adoption of the Code of 1897 by failing to insist upon them as against the alleged contract between George and his father. We think that as to plaintiff appellant has wholly failed to make out his case, and therefore, even if he had an oral contract with his father, it would not be valid as affecting plaintiff's right to insist that the homestead be set off to her as a part of her dower interest, irrespective of such

contract. But this branch of the case need not be further considered in view of our conclusion that no such contract with the father is made out.

III. Counsel for appellant urge strongly upon our consideration the fact that George parted with title to the eighty acres of land which had already been conveyed to him by his father in consideration of some arrangement by which he was to have the home farm. But the equities are not so persuasive as counsel would have us believe. It is conceded that the eighty-acre farm had been given to George by his father by way of advancement, and it results that George simply gave up an advancement; and, even if he acquired no title to the home farm, he is now, as heir, entitled to his share of the farm, subject to his mother's dower interest, and will receive a larger portion thereof than the other heirs to the extent that their shares have been lessened by the advancements made to them. In other words, George will receive as much property as he would have received had he retained his advancement and shared equally with the other heirs in the final distribution at his father's death. It is not claimed that he has supported his father and mother since the original arrangement was made in 1881, nor since his return to the farm in 1892. He has given to them some care and assistance, but, so far as we can see, he has received quite as much as he has given. Under the evidence it does not appear that one-half the grain rent has been an unusual rental to pay for the farm as he has occupied it, for considerable portions of it have been in pasture, for which he has paid no rent whatever, although he has had the use of the pasture for his stock. These suggestions are not made with the thought that any mere inequality or want of equity in the resulting distribution of the father's estate would help the appellant to make out the alleged contract with his parents, but only as bearing on the intent of the parties evidenced by their acts with reference to such alleged contract. We cannot see that there was any such manifest

unfairness in the arrangement with George to return and occupy the home farm as tenant, in view of the manner in which that arrangement was carried out, as to furnish persuasive evidence that he had some contract with his father by which he was ultimately to have the farm as his own.

IV.   In computing the value of the advancements made to Jennie Crane and Ellis Eastwood for the purpose of determining what shares the respective heirs should have in the property of which decedent died seized,

3. ESTATES OF DE-
CEDENTS: valu-
ation of ad-
vancements.

the trial court valued the land given to each of them at its worth at the time of conveyance, and on that basis charged Jennie Crane with an advancement of $2,000 and the heirs of Ellis Eastwood with an advancement of $3,000.   In this, we think, there was error. Code, section 3383, is as follows: "Property given by an intestate by way of advancement to an heir, for the purposes of the division and distribution thereof, shall be considered part of the estate, and be taken by him toward his share of the estate at what it would be worth if in the condition in which it was given to him, but if such advancement exceeds the amount to which he would be entitled, he cannot be required to refund any portion thereof."   The court should have estimated the value of the tracts of land thus conveyed by way of advancement at what they would have been worth at the death of decedent if in the condition in which they were at the time the advancements were made.   That is the plain requirement of the statute.   It is true that in the absence of statutory provision advancements are to be reckoned as of the time when made, unless the contrary appears from the terms of the conveyance.   2 Woerner, Administration, section 557.   But in several of the States this rule is changed by statutory provision, so that the advancement is valued at what it would have been worth at the death of the decedent without change in the condition of the property.   See 2 Woerner, Administration, section 559.

Counsel for appellee dwells upon the difficulties of

applying this rule as to personal property. No doubt, if the property is consumed or disposed of before decedent's death, the person to whom the advancement is made should be charged with what he realized or might reasonably have realized therefrom, for it could not be presumed to have been the intention of the one making the advancement that perishable property should be allowed to become worthless or to be squandered to the detriment of the other distributees; but no such question is presented in this case.

The advancements were of land, and the heirs who at decedent's death still are in possession and enjoyment of such land conveyed to them by their father should, under the language of the statute, be treated as though they had taken such land at his death, increase in value, however, due to improvements put by them upon the land, not being taken into account. This is the rule announced in *Finch v. Garrett,* 102 Iowa, 381, construing section 2459 of the Code of 1873, which is substantially in the same terms as section 3383 of the present Code.

It is urged that the omission of the word " now " from the phrase " what it would now be worth," as found in the section of the Code of 1873, indicates an intention on the part of the Legislature to change the construction given to the section as in *Finch v. Garrett.* It is true that some force is given in that case to the word " now," but with the omission of that word the section is not capable of any different construction. It was adopted by the Legislature as reported by the Code commission, and the commission in their general report, at page 1, say that: " In the exercise of the duty of rewriting the law and improving its phraseology the commission has made many verbal changes, but has done so with great care, in order that the meaning of the statute shall not thereby be materially changed." There is no suggestion by the commission, with reference to the section in question, that any change of meaning was intended. We have already said in

4. REVISION OF STATUTES: change in phraseology.

*Minneapolis & St. L. R. Co. v. Cedar Rapids, G. & N. W. R. Co.*, 114 Iowa, 502, with reference to the revision of the statutes by the commissioners who prepared the Code of 1897, that " a mere change in phraseology in the revision of a statute will not work a change in the law previously declared, unless it clearly appears that such was the. intention of the Legislature." We reach the conclusion, therefore, that Jennie Crane and the heirs of Ellis Eastwood should be charged by way of advancement for the land received by them from decedent at what its value would have been at the time of decedent's death had it remained in the condition in which it was at the time it was conveyed. The evidence shows without substantial controversy that each of these tracks of land would have been worth in that condition from $60 to $65 per acre, and therefore that Jennie Crane should be charged by way of advancement with $7,725 and the heirs of Ellis Eastwood, with $10,312.50. The decree of the lower court is modified to that extent, and in other respects it is affirmed.— *Modified and affirmed.*